[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This decision dissolves the fifteen-year marriage of Anna and John Kinghorn. The Judicial District of Tolland referred this fully contested case to the regional family trial docket for trial, held on two days in July 2002. Each party testified at trial, as did the following other individuals:
 • Paul Lorenzo, a family relations counselor employed by the Judicial Branch who prepared a custody evaluation dated February 6, 2002;
• The Rev. Mark Scholten, a friend of the defendant, and
 • Attorney James J. Sullivan, the court-appointed guardian ad litem (GAL).
Each party also introduced various exhibits into evidence, including the custody study prepared by family relations counselor Lorenzo.
After conclusion of testimony, the evidence remained open for the parties to submit additional evidence regarding life insurance, medical benefits, the defendant's annuity plan, and the guardian ad litem's fees. On August 16, 2002, the defendant moved to open the evidence to show a substantial change of his financial circumstances, to which the plaintiff filed a written objection; by agreement of the parties filed on December 19, 2002, the parties withdrew both the motion and objection. After that, the plaintiff filed a motion for payment of college expenses pursuant to public act 02-128, and requested an evidentiary hearing thereon. On November 24, 2002, the defendant filed a written objection to the GAL's requested fees. An evidentiary hearing was scheduled on both motions for December 20, 2002, but before then both parties stipulated that the court would determine the GAL's fees without further evidence and that the issue of college expenses should be deferred. CT Page 3009
The court has observed the demeanor of the parties and witnesses and evaluated their credibility. The court has carefully considered all of the evidence, including the exhibits and the testimony presented, according to the standards required by law. The court has carefully considered the statutory criteria for dissolving a marriage and entering orders regarding custody, visitation, child support, alimony, orders of life and health insurance and payment of the child's health expenditures, equitable distribution of property, and the award of counsel fees.
After making jurisdictional findings and a brief summary as to the background and situation of each party, the court will discuss the key issues here.
I — JURISDICTIONAL FINDINGS
The court finds that it has jurisdiction over the marriage, the first for each party. One party has resided in Connecticut continually for more than one year prior to the bringing of this action. The parties were married in Windsor, Connecticut on September 11, 1987. They have four minor children who are legal issue of the marriage: Joanna, born on November 13, 1990; Zachary, born on July 29, 1992; Jenna, born on March 21, 1995; and Julia, born on August 12, 1997. No other minor children have been born to the wife since the date of the marriage. The parties have not been recipients of state or municipal assistance. The marriage between the parties has broken down irretrievably with no reasonable hope of reconciliation.
II — THE PARTIES
The plaintiff, Anna Kinghorn, was 41 years old at the time of trial. A high school graduate, she is employed as a personnel patient assistant at Hartford Hospital, where she earns $532 weekly gross, which after mandatory state and federal tax deductions leaves her with $413 net weekly income. There was no evidence offered at trial that she has a greater earning capacity than her present income. After marrying the defendant, she worked for three years as a secretary until just before their first child was born. By agreement of the parties she then became a "stay at home mom" and the children's primary caretaker. She returned to work only after this action began.
The defendant, John Kinghorn, is a 48-year-old union electrician. His total income and earning capacity were issues in dispute at trial. The plaintiff claimed that he earned $1,500 gross weekly during the marriage, CT Page 3010 an amount that would annualize to $78,000 per year. The defendant testified, on the other hand, that he earned $75,000 in 2001, but only $56,000 the year before, and is subject to periodic layoffs. He claimed that he receives his work assignments directly from the union; that although his last job assignment lasted 8 1/2 years, the duration of each job assignment varies; and that, after a job is completed, he goes to the bottom of the union's job assignment list. The defendant testified that he had been unemployed for five weeks from March through May of 2002. The plaintiff acknowledged that the defendant frequently changed jobs, was occasionally unemployed, and had been laid off from employment for part of 2002. Neither party introduced tax records to document their claims as to the defendant's overall income, but the defendant did introduce three recent pay stubs showing that his current rate of pay is $29.30 per hour and that as of July 20, 2002, he had earned $10,551.20 gross pay during the eleven previous weeks in his most recent job assignment. Two of those pay stubs were for work weeks of 32 hours, and the third for a 40-hour work week; in that latter week, he earned $1,172 gross and $941.28 net.
The defendant was verbally and emotionally abusive to the plaintiff during the marriage and often called her extremely disparaging and degrading names. On occasion he also pushed or shoved her and punched holes in the walls with his fist. Some of these incidents occurred in front of the children, who told the guardian ad litem that they had witnessed fights and arguments between their parents and sometimes had to intervene. The children also told the GAL that their father used to yell a lot at their mother while they still lived together. The children were unhappy and uncomfortable witnessing such incidents.
On Memorial Day weekend of 1999, the defendant was arrested for breach of the peace after using physical force against the plaintiff during an argument with her. The plaintiff testified that the defendant pushed her to the ground, while the defendant claimed at trial that he grabbed her arm like he would a misbehaving parent at the ball field when he was coaching his children, escorted her outside the house, and then let her go, whereupon she fell to the ground. Whether he physically pushed her to the ground, as the plaintiff claimed, or used such physical force to restrain her that she fell to the ground when freed from his grasp, as he claimed, the defendant's use of physical force to dominate the plaintiff and control the argument that day was completely inappropriate.
After the defendant locked the plaintiff out of the house, the oldest child let her back in and she called the police. After the arrest, the court entered a partial protective order, and the defendant temporarily moved out of the marital home until he had completed a domestic violence program. Since he was not arrested for returning home before the CT Page 3011 protective order expired, the court infers that the order did not require him to vacate the premises. The defendant's emotional abuse of the plaintiff continued, however, and in June 2000 she obtained an ex parte restraining order requiring him to vacate the marital home. The court later extended that order by agreement of the parties. After the parties separated, they participated in marital counseling with Dr. Michael Ellovitch.
The defendant claimed at trial that the plaintiff often yelled at him or the children and would occasionally strike the children. Although the plaintiff's occasionally inappropriate and loud behavior at trial suggests that the defendant's claims about Ms. Kinghorn's temperament are plausible, any such behavior on her part would not justify his physical violence or verbal or emotional abuse toward the plaintiff. There was absolutely no evidence, however, to confirm the defendant's claim that the plaintiff has physically mistreated the children.
There was no evidence offered at trial that either party was not in good physical health. During the marriage the defendant had a drinking problem. He attended a substance abuse program and Alcoholics Anonymous because the incident that led to his arrest and a protective order had involved his use of alcohol. The evidence is mixed about whether that problem has continued since the parties finally separated. Although the defendant admitted that he no longer attends Alcoholics Anonymous and drinks at home on the weekends, both parties told the family relations counselor several times that alcohol abuse was no longer an issue. On the other hand, the plaintiff testified at trial that following the defendant's return home after the protective order his drinking problem became worse. She said she sometimes smells alcohol on his breath when they exchange custody of the children. She also said that a month before trial she found alcohol in his truck. (The parties exchange vehicles when they switch parenting time, the party with the children taking the jointly-owned van, and the other party taking the defendant's truck, which cannot safely transport all the children.)
The court is skeptical, however, of plaintiff's testimony that the defendant sometimes has alcohol on his breath when he takes the children for his parenting time. In view of the conflicted nature of this dissolution case, the court suspects that she would, if such had actually been the case, have notified the family relations counselor, police or the family court that her husband was driving with the children while intoxicated. Nonetheless, her concerns raise such a significant issue affecting the potential safety of the children that the court's orders will require the defendant to undergo substance abuse evaluation and any treatment recommended. CT Page 3012
III — THE CHILDREN
The evidence establishes that the parties' four children are all relatively normal. Before the parties separated, the plaintiff was their primary caretaker. The children even told the GAL that their father did not spend much time at home with them then but instead went out with his own friends. Since their parents separated, they have lived with their mother in the marital home and spent a few hours on Tuesdays and Thursdays and alternating weekends from Friday to Sunday evenings with their father. Since the separation, the defendant has become actively involved in the children's sports, extracurricular, and school activities. According to the family relations counselor and guardian ad litem, the children have a good relationship with each parent, and each party is a "very good parent." As part of the family relations evaluation, Dr. Ellovitch again met with each parent and individually with the children. It was his opinion that the children feel emotionally and physically safe with each parent. The children have adjusted well to living with just one parent, are doing well in school or day care, and, in the words of the GAL, are "thriving," in part because they no longer have to witness incidents of domestic violence between their parents, as the children often did when the parties lived together.
Each party has requested residential custody of the minor children. The defendant claimed at trial that the plaintiff is not attentive enough to the children and that one child had been injured while roller-blading without wearing proper safety equipment because of her inattentiveness. He also claimed that the plaintiff has struck the children and yells at them so much that they fear her. Finally, he complained about physical damage to the marital home since he left — rugs pulled up and rug tacks sticking up from the floor that could injure the children, animal feces on the floors, ruined plumbing facilities in the house, and uncompleted home repairs undertaken by unlicensed home contractors. There was no credible evidence, however, that plaintiff does not pay adequate attention to the children to protect them and meet their needs or has damaged the marital home. Despite her occasional inappropriate demeanor at trial, neither the GAL nor family relations counselor, who had more opportunities than the court to observe Ms. Kinghorn by herself and with the children, testified about any inappropriate temper or lack of self-control on her part. The court concludes that any issues in this area can be addressed post-trial without removing the children from the custodial situation that has served them so well since the parties separated.
The plaintiff has asked for sole custody because she maintains that CT Page 3013 communication and control problems will prevent the parties from being able to make decisions jointly. There is no persuasive evidence to support that claim, however. The parents and children have all done well during the pendente lite period when the parties shared joint custody, and there is no credible evidence they have been unable to make significant decisions jointly since these proceedings began.
The children all want to maintain the current arrangement of living primarily with their mother and visiting their father regularly for his parenting time. The family relations counselor concluded that the children's best interest was to retain the current schedule, since it was meeting their needs and any change would probably affect them negatively. The GAL concurred that the basic contours of the present schedule, under which the children live primarily with their mother and the defendant has parenting time twice during the week and on alternating weekends, was in the children's best interest. Both parties, the family relations counselor, and GAL all agreed that it was in the children's best interest to continue living in the family home, regardless of which party was the primary residential parent.
As this court has noted before, "[t]he best interest standard is inherently flexible and fact-specific to each child; giving the court broad discretion to consider all the different and individualized factors that might affect a specific child's welfare." In re Diane W., Superior Court for juvenile matters, child protection session at Middletown (December 21, 2002). The courts have found many factors to affect a child's "best interest," including a child's interest "in sustained growth, development, well-being, and in the continuity and stability of [his] environment"; Capetta v. Capetta, 196 Conn. 10, 16, 490 A.2d 996
(1985). See e.g. Seymour v. Seymour, 180 Conn. 705, 710ff, 433 A.2d 1005
(1980); Janik v. Janik, 61 Conn. App. 175, 181, 763 A.2d 65 (2000), cert. den. 255 Conn. 940, 768 A.2d 949 (2001); Rudolewicz v. Rudolewicz, 12 CLT No. 39, p. 664, Superior Court, judicial district of Hartford-New Britain (October 6, 1986, Arena, J.).
The cause for the dissolution here is primarily the defendant's verbal, emotional, and occasional physical abuse of the plaintiff. Because of that abuse, the plaintiff obtained a restraining order that gave her residential custody of the children and required the defendant to vacate the marital home. The children have benefited from no longer having to witness that abuse, and adjusted so well to the pendente lite custodial arrangement caused by the defendant's abuse that changing their primary residential parent would affect them negatively.
In making its decision here, this court has considered the body of case CT Page 3014 law regarding best interest, the specific facts of this case, the testimony and credibility of the various witnesses here, and the court's assessment and evaluation of the best interest of the three specific children affected here. The court finds the testimony and conclusions of the family relations counselor and guardian ad litem as to custody credible and persuasive. The court finds that an order of joint custody, with the children living primarily with their mother, to be in their best interest.
As for the defendant's parenting time, both the family relations counselor and GAL recommend continuing the present arrangement that the children see their father two evenings during the week and on alternating weekends. Although both initially recommended at trial that the defendant's week day parenting time end in the early evening, when asked about extending those visits to overnight, the Family Relations counselor, Lorenzo, had no objection and the GAL testified that overnight visits would be preferable. Lorenzo, however, said that if the children spent weeknights with their father, continuous time with each parent would be preferable, rather than alternating nights with each parent. (The effect of converting the present orders to overnights would be that the children would spend Monday night with plaintiff, Tuesday with defendant, Wednesday with plaintiff, Thursday with defendant and then alternating weekends with each parent.) The court finds that one weekday overnight with the defendant would be appropriate, facilitate the defendant assuming a parental role in the children's everyday lives, yet not break too much the present pattern that has so benefited the children. In deference to the family relations counselor's concern about continuity of time with each parent, with which the court concurs, the defendant's weekday visitations shall be from Wednesday afternoon until Thursday evening.
IV — FINANCIAL ISSUES
The primary financial issues between the parties are the amount and duration of alimony, amount of child support, the marital home, which party will get which motor vehicle, allocation of the defendant's two pension benefits, and counsel fees. The parties also reserved for this court the resolution of the defendant's March 15, 2002 motion to modify support pendente lite and plaintiff's March 28, 2002 motion for contempt. The court will address these issues in turn.
A. Property Distribution
"There are three stages of analysis regarding the equitable distribution of each resource; first, whether the resource is property CT Page 3015 within Section 46b-81 to be equitably distributed (classification); second, what is the appropriate method for determining the value of the property (valuation); and third, what is the most equitable distribution of the property between the parties." Krafick v. Krafick, 234 Conn. 783,792-93 (1995). The court finds that all items, listed on each party's financial affidavit as assets, are property within the meaning of §46b-81 and hence subject to equitable distribution by the court. The defendant is fully vested in two deferred compensation plans, the International Brotherhood of Electrical Workers (I.B.E.W.) Local Union #35 annuity plan that had a value as of June 30, 2002, of $35,476.61, and an N.E.C.A-I.B.E.W. pension that will pay him $1,390.80 per month "at normal retirement if paid under the single life annuity form of payment." (Pl.'s Ex. 4.)
The plaintiff claimed at trial and on her financial affidavit that the defendant also owns stocks, bonds, or mutual funds. She offered no proof of such, however, other than her own testimony, in which she conceded that she did not know for certain that he had such investments but believed he had because during the marriage he said he intended to make such purchases. Although statement of a present intention to do a future act is certainly competent evidence that the declarant performed that future act, as the venerable case of Mutual Life Insurance Co. v.Hillmon, 145 U.S. 285 (1892) first recognized and our law of evidence has long acknowledged; Commentary, Conn. Code of Evidence, § 8-3 (4); the court finds such evidence here too thin and inconclusive to so find.
The plaintiff also claims that the defendant took two rings of hers, an allegation that he denies, although the defendant acknowledged that the rings were hers. The court finds the evidence, as to whether the defendant took the rings, inconclusive. Its orders are that the defendant return them, if he has them.
The plaintiff seeks award of the marital home, ownership of the Dodge Caravan vehicle, and 60% of any deferred compensation benefits or stocks belonging to defendant. The defendant also seeks the marital home and Dodge Caravan and asks that equitable distribution of his pension exclude benefits he accrued before the marriage. The parties agree that the marital home has no, or virtually no, equity and base their requests for the marital home in part on their claim for primary residential custody of the children. The Dodge Caravan is the only vehicle of either party that is suitable and safe for driving all four children.
After considering all the statutory factors pertinent to property distribution, the court awards title and ownership of the marital home and Dodge Caravan to plaintiff and of the Ford truck listed on CT Page 3016 defendant's financial affidavit to defendant. The court awards the plaintiff one-half of defendant's annuity and one-half, less the coverture fraction defined later in the margin, of the defendant's pension.
 B. Alimony
The defendant has significantly better vocational prospects than the plaintiff. As a skilled worker in an essential trade, he has job skills that should carry him gainfully through to retirement. The plaintiff, on the other hand, was out of the work force for more than ten years, and has now returned to employment in a relatively low-paying position, compared to defendant's income and earning capacity. She may never earn as much as the defendant. She will need time to improve her vocational skills in order to support herself better than she can right now. Having primary care responsibilities for four children will lengthen the time it would otherwise take her to become self-sufficient. Her husband's emotional and physical abuse has put her in a financially insecure position. In view of all the statutory factors for award of alimony, particularly the cause of the dissolution, the plaintiff's limited financial means and prospects, and her limited vocational potential, the court orders the defendant to pay the plaintiff alimony in the amount of $100 per week for 17 years.
C. Child Support
The principal issue with regard to child support is the defendant's income and earning capacity. As recounted above, the evidence on those questions was in dispute. At the time of trial, his average weekly income during the prior 11 weeks in his new job was $959.20 gross and $686.21 net, which annualize to $49,878.40 gross income and $35,682.92 net. The child support guidelines require the court, in determining an award of child support, first to determine each party's actual current gross and net income and, using those figures, determine the presumptive current support amount. See Regs. Conn. State Agencies, §§ 46b-215a-2a (c) and (d). The amount of defendant's presumptive child support payment, based on his income at the time of trial, is $252 per week.
A party's earning capacity may be considered, however, as a criterion for deviating from the presumptive support amount. Regs. Conn. State Agencies, § 46b-215a-3 (b) (1) (B). The defendant's income varies from year to year, based on his work assignments. No particular pay period is necessarily representative of his earning capacity. It would be inequitable and inappropriate to apply the presumptive support amount here. The court finds instead that it is fair and appropriate to apply the deviation criterion of the defendant's earning capacity in CT Page 3017 determining child support. From the totality of the evidence, including the testimony of each party, the court finds an annual earning capacity on the defendant's part of $60,000 gross and approximately $49,000 net. This finding takes into account that the defendant will have episodes of unemployment while awaiting new job assignments, but will also have periodic opportunities in the future, as in the past,[1] to earn extra through working overtime or as a foreperson. Applying the calculations and methodology of the child support guidelines, the court orders defendant to pay plaintiff weekly child support of $310, plus 40% of all unreimbursed health-related expenditures exceeding one hundred dollars per year and all qualifying child care expenses.
D. Counsel Fees
The plaintiff has requested that the defendant pay counsel fees and assume responsibility for paying the fees of the minor child's guardian ad litem. The defendant's proposed orders contain no requests with regard to counsel fees. Pursuant to general statutes § 46b-62, the court has authority to order payment of counsel or GAL fees after consideration of "their respective abilities and the criteria set forth in section 46b-82." Moreover, the court must take care that its determination of this question does not substantially undermine its other financial orders.
In determining whether to award counsel fees the trial court must consider the total financial resources of the parties in light of the statutory criteria. The statutory criteria are to be applied in light of the following three broad principles: First, such awards should not be made merely because the obligor has demonstrated an ability to pay. Second, where both parties are financially able to pay their own fees and expenses, they should be permitted to do so. Third, where because of other orders, the potential obligee has ample liquid funds, an allowance of counsel fees is not justified. If, on the basis of the total financial resources of the parties, the trial court concludes that denying an award of counsel fees would not undermine its purpose in making its prior financial orders, the court should allow each party to pay his or her own counsel fees.
(Citations omitted; quotations omitted.) Miller v. Miller,16 Conn. App. 412, 418, 547 A.2d 922 (1988).
The court has reviewed the affidavit of fees for service submitted by the guardian ad litem for the minor children and finds he reasonably expended 40.2 hours in this matter. The court finds that the hourly rates he charged were fair and reasonable and that his total fee of $9,450 is also fair and reasonable for his services. CT Page 3018
Taking into consideration all the statutory factors mandated by §§46b-62, as elucidated by the Appellate Court in Miller v. Miller, and the evidence in this case, the court orders the defendant to pay the unpaid balance of GAL fees and for each party to assume responsibility for its own counsel's fees.
 E. Motions to modify support and for contempt
On March 15, 2002, the defendant filed a motion to modify the pendente lite order that he pay alimony of $100 and child support of $400. He claimed that he had been recently laid off from his job and was then collecting unemployment compensation benefits, and that the original order entered when plaintiff was not yet employed. On March 28, 2002, the plaintiff filed a motion for contempt alleging that the defendant was not complying with the pendente lite orders. The parties have agreed the court should address these issues as part of the decision dissolving the marriage.
A financial affidavit the defendant filed on March 12, 2001, the date of the initial pendente lite order, claimed he was making $1,024 per week gross and $809.44 net income. A child support guidelines worksheet completed by counsel for the plaintiff and filed that same day included those same income figures and calculated the defendant's presumptive support amount as $409. The court then accepted an agreement of the parties that defendant would pay pendente lite child support of $400 per week, plus $100 alimony. The agreement also noted that defendant would "bring the mortgage current as of 4/1/00." Since this action was not commenced until October 2000, the court infers that the date of "2000" was a scrivener's error and was intended and interpreted by all to mean "2001," particularly since defendant testified that he made three late mortgage payments after the pendente lite order.
From the testimony at trial, the court finds that sometime in March 2002 the defendant was laid off from work, and while unemployed for five weeks he collected unemployment compensation benefits of $460 per week gross and $362 net. In early May he resumed working, and in the eleven weeks from then to the start of trial he earned $10,551.20 gross and $7,548.31 net income in his new job, or an average during that time of $959.20 gross and $686.21 net income per week. The defendant's average gross weekly income during those sixteen weeks was $803 and his average net weekly income was $585. The court finds this reduction in income to be a significant change in circumstance warranting a reduction in his pendente lite child support payments for those sixteen weeks. The court finds that the presumptive pendente lite child support amount, based on CT Page 3019 this reduced income from the time he was laid off until the start of trial, is $252 per week. Because of the court's conclusion above, however, that it is inappropriate to apply the presumptive support amount, in view of the defendant's greater earning capacity, the court finds that a fair and equitable support level from the time defendant was laid off should apply the deviation criterion of his overall earning capacity. The court thus grants defendant's motion to modify his child support payment to $310 per week, retroactive to the date said motion was filed. The court denies any reduction in pendente lite alimony paid. The court credits all payments made by defendant first to his alimony obligation, so that any arrearage owed is for child support.
The plaintiff testified at trial that the defendant was, as of the date of trial, $7,305 in arrears on his support payments toward the original pendente lite order. The defendant admitted at trial that he was behind in his pendente lite support payments but claimed that he should be entitled to credits against any arrearage for mortgage and utility payments he claims to have made since that order. He testified that between the date of the original order and trial he had paid plaintiff approximately $34,000 towards support, whereas the pendente lite called for him to have paid $35,500 over that time period.
Since the defendant admitted that the three mortgage payments he claimed to have made had included penalties, which the court infers to be mortgagee charges for late payments, the better weight of evidence suggests that any mortgage payments he made were to satisfy the terms of the court order to bring the mortgage current, rather than voluntary additional payments that should count toward his support obligation. Although also claiming to have made various utility payments, he did not specify dates or amounts; such testimony does not establish a credible basis for a credit toward the arrearage. On the totality of the evidence, the court therefore finds the plaintiff's claim as to the amount of the arrearage, as calculated on the pendente lite order, credible.
The court's modification of pendente lite child support, however, reduces his arrearage by $1,440, because instead of $6,400 being the amount of child support due for the sixteen weeks between his layoff and the start of trial, $4,960 would fully satisfy his pendente lite child support obligation for that period. The court thus finds the defendant in arrears in his pendente lite support in the amount of $5,865 ($7,305 minus $1,440). From the testimony at trial, the court finds that such arrearage was willful. The court thus grants plaintiff's motion for contempt. The final orders will effectuate the court's findings here. CT Page 3020
Section 46b-87 of General Statutes governs the award of counsel fees in contempt proceedings. "The award of attorneys fees in contempt proceedings is within the discretion of the trial court" without requiring the balancing of the parties' respective financial abilities. (Quotation marks omitted; citations omitted.) Eldridge v. Eldridge, 244 Conn. 523,534, 710 A.2d 757 (1998). Most of the evidence regarding the changed income situation of defendant would have been necessary and relevant in the trial, regardless of the contempt motion. Based on the factual circumstances here, the court thus concludes that an award of counsel fees to plaintiff is not appropriate.
V — FINAL ORDERS
After considering all the statutory factors set forth in General Statutes § 46b-56 as to custody and visitation, § 46b-81 (c) as to equitable distribution of property, § 46b-82 as to alimony, §46b-84 as to support of a minor child, § 46b-215a-1 et seq., Regs. Conn. State Agencies as to child support, and §§ 46b-62 and 46b-87 as to counsel fees, together with applicable case law and the evidence presented here, the court hereby enters the following orders:
 1. Dissolution of Marriage
The marriage of the parties, having broken down irretrievably, is hereby dissolved.
2. Parenting Orders[2]
The parties shall share joint legal custody of the four minor children, with each party having parenting time as set forth below.
a) The order of joint custody requires that each party consult with the other party and that they together make all major decisions regarding their children, unless urgent circumstances make that impractical. Major decisions shall mean issues affecting the children's health, growth and development, and shall include but not be limited to non-emergency medical, dental, or mental health care or treatment; education; spiritual and religious upbringing and practices; extended absences from school; matters regarding automobiles and driving; and employment during the school year or vacations. Whenever either parent makes an appointment for health care of the children, that party shall, if practicable, immediately notify the other, with sufficient time for that other parent to attend the appointment. If the parents cannot agree on the children's spiritual or religious upbringing and practices, then the party with parenting time may decide which religious practices the children observe CT Page 3021 while with that party. Routine day-to-day decisions, including but not limited to homework, day-to-day school, social and athletic activities customary for each child's age and maturity, shall be made by the parent with whom the children are staying at the time such decisions must be made. Whichever party is exercising parenting time will have authority to make decisions as to emergency medical, dental, or safety matters but shall immediately notify the other.
b) The defendant shall have parenting time with the minor children during the week from Wednesday at 5:00 p.m., or such earlier time that day as he is able to pick them up, until Thursday evening at 7:00 p.m., and on alternating weekends from Friday at 5:00 p.m. until Sunday at 7:00 p.m. The plaintiff shall have parenting time with the minor children at all other times, except as set forth below.
c) Vacation and Holiday modifications:
(1) Vacation and holiday periods shall modify the above schedule and not be included in the alternating weekend rotation.
(2) Each parent may spend two uninterrupted, non-consecutive weeks during the summer with the four minor children. The parties shall notify each other by April first of each year of the two week-long periods they seek with the children. If both parties seek the same weeks for their exclusive summer parenting time, then in odd-numbered years the mother shall make the final decision and in even-numbered years the father may do so with regard to which parent spends which summer weeks with the children.
(3) The minor children will divide the Christmas holiday vacation so that one party has parenting responsibility from after school on the day the vacation begins until 11:00 a.m. on Christmas day and from 11:00 a.m. on New Year's Day until the children return to school; the other party will have parenting responsibility from 11:00 a.m. on Christmas morning until 11:00 a.m. on New Year's Day. In 2003 the father will have parenting responsibility for the portion of this cycle that includes Christmas eve.
(4) The minor children will alternate all legal and school holidays between their parents. The parties will divide equally their parenting time during school year vacation weeks, the children spending Sunday evening through Wednesday evening at 6:00 p.m. with one parent, and Wednesday evening through Sunday evening at 6:00 p.m. with the other parent; unless the parties agree otherwise, the children will begin the vacation week with the party that had parenting time on the immediately CT Page 3022 preceding Saturday (such that they spend from Friday of the weekend before at 5:00 p.m. through Wednesday evening of the vacation week with that parent). They shall spend mother's day with plaintiff and father's day with defendant.
d) Both parents shall have reasonable telephone contact with the minor children when the children are with the other parent. Reasonable shall mean at least one telephone call a day.
e) Both parents shall treat each other with respect and courtesy. Neither parent shall make any derogatory remarks about the other parent in front of the children or within their hearing. Each parent shall seek to foster a close, loving, respectful, and positive relationship of their children with the other parent.
f) Both parties shall immediately notify the other of any serious or emergency health issues involving a child when any of them are with that parent, and shall keep the other party informed of routine health matters involving all the children, including advance notice whenever practicable of all medical appointments.
g) The plaintiff wife shall not permanently remove the minor children from the State of Connecticut without giving the defendant 90 days prior written notice.
 3. Equitable distribution of property
Each party may retain, free and clear of the other, all assets listed on their respective affidavits, except as set forth below.
a) The court awards title and interest to the marital home at 10 Strong Street in Manchester to the plaintiff wife, free of any claim of the defendant. The defendant shall by quitclaim deed convey to the plaintiff all of his right, title and interest in such property. After the defendant has conveyed his interest in the house to the plaintiff, the plaintiff shall indemnify the defendant and hold him harmless for any liability he may incur for the first mortgage or real estate taxes accruing or payable after the date of the quitclaim deed to plaintiff.
b) The court awards the plaintiff one-half of the coverture fraction, as described in the margin,[3] of defendant's vested union pension shown on his financial affidavit, based on its value as of the date of this decision. As there was no evidence as to when the defendant began participating in the union annuity plan, the court cannot determine a coverture fraction for that plan and therefore awards to the plaintiff CT Page 3023 half the value of that plan on the date of this dissolution. Defendant's counsel shall prepare the appropriate qualified domestic relations orders, and the parties shall share equally the cost of preparing the QDROs. The court shall retain jurisdiction for purposes of approving the QDROs.
c) The court awards title and ownership interest in the Dodge Caravan to the plaintiff and the Ford F-150 truck to the defendant. The parties shall execute any legal documents necessary to effectuate any titles or ownership interest thereon.
d) Personal Property: The court awards ownership of the plaintiff's diamond and gold ring to her; if the defendant has possession of either such ring, he shall immediately return such to her. Although plaintiff's proposed orders claimed that defendant had removed a computer and pictures of the children from the marital home, there was insufficient evidence to establish that defendant had removed such items from her home or to support an order that they be returned. As the parties requested no other orders regarding items of personal or household property, the court makes none.
 4. Debts and liabilities
Except for GAL fees, addressed separately in these orders, each party shall be responsible for paying all debts and liabilities listed on their respective financial affidavits, and shall indemnify and hold the other harmless thereon.
 5. Alimony
a) The defendant shall pay plaintiff alimony in the amount of $100 per week for seventeen years from the date of this decision. The first payment shall be due one week from the date of this decision. Such amount shall terminate upon death of either party, remarriage of the plaintiff, or her cohabitation with a male pursuant to General Statutes § 46b-86
(b).
b) The Court hereby orders an Immediate Wage Withholding Order pursuant to General Statutes § 52-362 in order to secure the payment of the alimony order.
 6. Child Support
a) The defendant shall pay the plaintiff child support in the amount of $310 per week until the eldest child graduates from high school or CT Page 3024 reaches age nineteen, whichever comes later. After that, the non-custodial parent shall pay child support in an amount to be determined by a court of competent jurisdiction based on then-applicable child support guidelines.
b) Health insurance for the minor children. Under General Statutes § 46b-84 (f), the court dissolving a marriage must include provisions in the support order for health insurance coverage for any minor children. The court orders the defendant to continue providing health insurance for the minor children that is comparable in scope or better than that offered under the HUSKY plan established in general statutes § 17b-289 et seq. so long as such insurance is available to the defendant through his employment at a cost less to him than HUSKY insurance. If such cost exceeds the cost of HUSKY insurance, or if the defendant loses the right to obtain health insurance for the minor children through his employment, then the primary custodial parent of each minor child shall maintain health insurance for that particular child.
c) Unreimbursed child care and health expenses. In addition, the plaintiff shall pay 60% and defendant 40% of unreimbursed medical and health-related expenses for the minor children (after the first one hundred dollars a year, which is the responsibility of the custodial parent), and of reasonable child care expenses necessary to allow either parent to maintain employment. Health-related expenses shall include medical, dental, orthodontic, vision, hearing, psychological and mental health expenses.
d) Post-secondary educational expenses: Pursuant to written stipulation of the parties and the guardian ad litem, the Superior Court retains jurisdiction over the issue of an educational support order underP.A. 02-128. Either party may in the future, by motion or petition, request the court to enter such an order.
 7. Pendente lite support arrearage
The court orders the defendant to pay the pendente lite child support arrearage in the amount of $5,865 at the rate of $62 per week until fully repaid.
 8. Wage withholding order
Pursuant to General Statutes § 52-362, the court enters an order for immediate wage withholding for payment of child support and child support arrearage, subject to the rights of the parties after issuance of CT Page 3025 this decision to agree to an order of contingent withholding. The court has no evidence as to whether the defendant has previously been advised of the minimum amount of income which is exempt from withholding under state and federal law, his right to claim any applicable state or federal exemptions with respect thereto, and his right to offer any evidence as to why a withholding order effective immediately should not issue. The defendant may, upon motion to the court, offer any evidence as to why a withholding order should not issue.
 9. Tax exemptions
The parties shall equally divide the child tax exemptions and child tax credits except in years when they are not able to claim such for an even number of children. When the parties are only able to claim tax exemptions for an odd number of children, they shall divide them unequally and alternate years in which one may claim more than the other; in the first such year, defendant may claim the greater number of exemptions and credits.
10. Life Insurance
The defendant shall maintain the $5,000 life insurance policy listed on his financial affidavit, naming the plaintiff as primary beneficiary and any minor children as secondary beneficiaries, for as long as he remains legally obligated to pay alimony or child support.
11. Counsel and GAL Fees
Each party shall be responsible for paying its own attorneys fees. The defendant shall pay the guardian ad litem the sum of $8,250 for his services. The defendant shall make arrangements for payment within two weeks of this decision; this court reserves jurisdiction to resolve any disputes.
12. Counseling/other orders in the children's best interest
Under General Statutes § 46b-56 (g),[4] the court enters the following orders as in the best interest of the minor children:
a) Anger management counseling for plaintiff. The plaintiff shall immediately enter and complete anger management classes and counseling, to be conducted by someone approved by the family relations counselor.
b) Substance abuse evaluation and follow-up treatment for defendant. The court orders defendant to undergo an immediate substance abuse CT Page 3026 evaluation to determine whether and what treatment or counseling may be appropriate to deal with any substance abuse problems he may have. Such an evaluation shall be conducted by someone approved by the family relations counselor. Defendant shall comply with any recommendations for treatment or counseling resulting from such evaluation. Defendant shall not consume any alcohol while with the minor children or within the twenty-four-hour period before he has parenting time with them.
c) The Superior Court shall retain jurisdiction regarding the compliance of each party with the terms of this section. Each party shall submit to the court satisfactory documentation of having begun compliance with these orders (defendant, by having completed the substance abuse evaluation and begun any treatment recommended; plaintiff by having commenced and maintained participation in anger management classes or counseling) within ninety days of the date of this decision.
BY THE COURT,
 STEPHEN F. FRAZZINI JUDGE OF THE SUPERIOR COURT